**CARTER TUG SERVICE, INC., a Delaware corporation, Plaintiff,**

v.

**The HOME INSURANCE COMPANY, a corporation, Defendant.**

**No. P–3119.**

United States District Court, S. D. Illinois, N. D.

June 16, 1971.

Robert D. Barnes of McBride, Baker, Wienke & Schlosser, Chicago, Ill., for plaintiff.

William F. Voelker, Jr., of Heyl, Royster, Voelker & Allen, Peoria, Ill., for defendant.

## DECISION AND ORDER

ROBERT D. MORGAN, District Judge.

The plaintiff in this suit in admiralty seeks to recover upon a marine hull insurance policy issued by defendant. Plaintiff claims this policy covered damage sustained as a result of the sinking of plaintiff's Motor Vessel "Christine Marie" on February 17, 1969.

The parties have stipulated that in the event of a determination that plaintiff is entitled to recover under the policy that judgment may be entered herein in favor of plaintiff and against the defendant in the sum of $19,000, exclusive

of interest and costs, for loss and damage to the Motor Vessel "Christine Marie" (such loss being in the total amount of $21,500, less the deductible average applicable to said vessel under said policy in the amount of $2,500), and that in the event plaintiff is determined to be entitled to prejudgment interest on such sum or any part thereof, interest may be awarded at the rate of six percent (6%) per annum as follows:

1. On the sum of $10,500 for the period from July 1, 1969 to the date on which judgment is entered; and

2. On the additional sum of $8,500 for the period from July 1, 1970 to the date on which judgment is entered.

The issues under the policy are whether the loss to the Motor Vessel "Christine Marie" was occasioned and proximately caused by a peril or perils of the water of the Illinois River between Mile 130 and Mile 170 thereof, or by any one or more of the other perils or risks insured against under the policy, or whether such loss resulted from an unseaworthy condition of said vessel, a breach of any warranty of seaworthiness, or the want of due diligence by her owners or managers.

Trial was held on April 27 and 28, 1971. The court, after considering the pleadings, evidence, exhibits, stipulations, briefs and proposals of the parties, now makes and files herein its findings of fact and conclusions of law, separately stated.

## FINDINGS OF FACT

1. At all times material hereto, plaintiff was the owner and operator of the Motor Vessel "Christine Marie," a vessel of the United States, Official Number 502347.

2. At all times material hereto, plaintiff was a corporation incorporated under the laws of the State of Delaware, with its principal place of business in Peoria, Illinois, and was duly authorized to transact business in the State of Illinois.

3. At all times material hereto, defendant, The Home Insurance Company,

was a corporation having its principal place of business in the State of New York and an office and place of business in Peoria, Illinois.

4. The Motor Vessel "Christine Marie" was built in the year 1965 and was put into service in 1965. She was a steel diesel towboat having a length of 56 feet.

5. On or about August 22, 1968, defendant, for valuable consideration, issued to plaintiff its hull policy of marine insurance No. MH496443, a copy of which is attached to the complaint as Exhibit "A," and thereby did insure plaintiff upon said vessel "Christine Marie" for the period commencing September 24, 1968, at noon, Central Standard Time, and ending September 24, 1969, at noon, Central Standard Time, in the amount of $75,000, the amount of her agreed value as set forth in said hull policy.

6. In and by said hull policy of marine insurance, defendant agreed to insure plaintiff against loss of or damage to said vessel "Christine Marie," caused by or resulting from perils of the waters of the Illinois River between Mile 130 and Mile 170 thereof, by a "perils" clause, which is as follows:

"Touching the adventures and perils which this Company is contented to bear and take upon itself, they are of the waters named herein, fire, lightening, earthquake, assailing thieves, jettisons, barratry of the master and mariners and all other like perils that shall come to the hurt, detriment or damage of the vessel named herein."

7. The policy also contains the so-called "Inchmaree" clause, which is as follows:

"This insurance also covers loss of or damage to the vessel named herein directly caused by:

Accidents in loading, discharging or handling cargo, or in bunkering;

Accidents in going on or off, or while on drydocks, graving docks, ways, marine railways, gridirons or pontoons;

Breakdown of motor generators or other electrical machinery and electrical connections thereto, bursting of boilers, breakage of shafts, or any latent defect in the machinery or hull (excluding the cost and expense of replacing or repairing the defective part);

Contact with aircraft, rockets or similar missiles, or with any land conveyance;

Negligence of charterers and/or repairers, provided such charterers and/or repairers are not assured(s) hereunder;

Negligence of master, mariners, engineers or pilots; provided such loss or damage has not resulted from want of due diligence by the assured, the owners or managers of the vessel, or any of them."

8. The vessel "Christine Marie" foundered and sank in the early morning hours on February 17, 1969 at about Mile 152.2 of the waters of the Illinois River.

9. On February 16 and 17, 1969, prior to her sinking, the vessel "Christine Marie" was equipped with at least two electrically operated bilge pumps, one being located in the port bilge in the engine room and the other being located in the starboard bilge in the engine room. A discharge hose of each pump was connected to a steel elbow affixed to each side, respectively, of the "Christine Marie" so as to discharge water through openings in her hull. The "Christine Marie" was also equipped with a portable electrical transfer pump which was smaller in size than her bilge pumps and which was used primarily for the transfer of fuel but which on occasion was used by the crew in pumping and discharging water from the bilges.

10. Check valves were first installed in the bilge discharge systems of the "Christine Marie" in the spring of 1968.

11. During the period from January 1, 1966 through February of 1968, the "Christine Marie" was operated and navigated on the waters of the Illinois River on or during a total of over 550 different days without check valves in her bilge discharge systems. During this period she was operated and navigated to and from the points and places on the Illinois River and performed the towage and other services set forth in her daily logs for such period, which were all received in evidence.

12. The function of the check valves used at times thereafter on the "Christine Marie" was to permit water to be discharged through the bilge discharge hoses and lines and the bilge discharge openings in the hull of the vessel but to prevent water from entering the vessel through such openings, lines and hoses.

13. In February of 1969, the normal freeboard of the "Christine Marie," fully loaded, was about twenty-four inches. When her freeboard was about twenty-four inches, the bilge discharge opening in her hull of her port bilge discharge system was approximately seven (7) inches above the water level of the river.

14. The M/V "Christine Marie" was taken out of service on or about January 18, 1969, and was out of service until approximately 9:30 p. m. on February 13, 1969. During this period of time she was in drydock of The Ohio River Company, at Kingston Mines, Illinois.

15. Before the M/V "Christine Marie" was put back into service on February 13, 1969, she was checked by plaintiff's president, Mr. William R. Martyn, for the purpose of determining that she was in good operating condition. Mr. Martyn did not make any inspection of the bilge discharge lines of the M/V "Christine Marie" at this time and he testified that he did not think he was in the engine room of the "Christine Marie" at any time during this inspection.

16. The "Christine Marie" was returned to service at about 9:30 p. m. on February 13, 1969, and thereafter, prior to her sinking on February 17, 1969, was based in Pekin, Illinois.

17. From about 9:30 p. m. on Thursday, February 13, 1969 until about 9:00 a. m. on Friday, February 14, 1969, the

M/V "Christine Marie" was operated and navigated to and from points and places on the Illinois River in the vicinity of Pekin, Illinois, and used to perform towage and other services which involved at least seven different normal tasks. During this period her crew consisted of Philip S. Knowles (pilot) and Larry D. Petit (deckhand).

18. From about 9:00 a. m. on Friday, February 14, 1969 until about 9:00 p. m. on Friday, February 14, 1969, the M/V "Christine Marie" was operated and navigated to and from points and places on the Illinois River in the vicinity of Pekin, Illinois, and used to perform towage and other services which involved several different normal operations. During this period her crew consisted of Paul Vaughn (pilot) and Donald L. Greenhalgh (deckhand).

19. From about 9:00 p. m. on Friday, February 14, 1969 until about 9:20 a. m. on Saturday, February 15, 1969, the M/V "Christine Marie" was operated and navigated to and from points and places on the Illinois River in the vicinity of Pekin, Illinois, and used to perform towage and other services which involved several different normal operations. During this period her crew consisted of Philip S. Knowles (pilot) and Larry D. Petit (deckhand).

20. From about 9:20 a. m. on Saturday, February 15, 1969 until about 9:00 p. m. on Saturday, February 15, 1969, the M/V "Christine Marie" was operated and navigated to and from points and places on the Illinois River in the vicinity of Pekin, Illinois, and used to perform towage and other services which involved several different normal operations. During this period her crew consisted of Paul Vaughn (pilot) and Donald L. Greenhalgh (deckhand).

21. From about 8:45 p. m. on Saturday, February 15, 1969 until about 9:00 a. m. on Sunday, February 16, 1969, the M/V "Christine Marie" made one trip from Pekin, Illinois, to Cargo Carrier's dock, where she picked up empty barge FM–29 and towed such barge to Pekin, Illinois, and tied it off at the Pekin fleet of plaintiff. During this period her crew consisted of Philip S. Knowles (pilot) and Donald L. Greenhalgh (deckhand).

22. On Sunday, February 16, 1969, the "Christine Marie" was operated out of and in the vicinity of Pekin, Illinois. Her crew from 9:00 a. m. to 9:00 p. m. on this day shift consisted of Larry R. Moore (pilot) and Donald L. Greenhalgh (deckhand).

23. From 9:00 p. m. on February 16, 1969 until the "Christine Marie" sank in the early morning hours of February 17, 1969, her crew consisted of Philip S. Knowles (pilot) and Larry D. Petit (deckhand).

24. Prior to February 16, 1969, Knowles, a high school graduate, had been employed by The Ohio River Company for a period of approximately twelve years (1955 until 1967) in various capacities as deckhand, second mate, first mate and steersman. As first mate, his duties included complete maintenance of the vessels on which he was employed and maintenance of crew discipline. As a steersman, he was learning to be a pilot under the guidance of a Captain. In February of 1966, he took and passed five days of written tests given by the U. S. Coast Guard and obtained from the U. S. Coast Guard a first class pilot's license, unlimited tonnage, which he held at the time of trial. While employed by The Ohio River Company, he served in various capacities on a majority of the vessels operated by such company, including the Motor Vessels "Des Plaines," "Henry S. Sturgis," "W. W. Marting," "A. H. Crane," "T. G. Gerow," "Mike Creditor" and "City of Huntington." Those vessels ranged in size from 900 to 2,300 horsepower and were of varying dimensions.

25. Larry R. Moore was first employed by plaintiff in 1964 or 1965. He graduated from Beardstown High School, Beardstown, Illinois, in 1955. Prior to his first employment by plaintiff in 1964 or 1965, Moore had been employed in various capacities (deckhand, watchman and second mate) by The Ohio River Company on vessels ranging from 1,600

to 2,500 horsepower in size, which were operated on the Illinois Waterway and the Upper Mississippi River.

26. Prior to employment by plaintiff, Donald L. Greenhalgh had been employed by The Ohio River Company for 16 years. During such employment he had served on every vessel which that company had operated in its Illinois Division.

27. Larry D. Petit had eleven grades of school and no prior experience when employed by plaintiff. At the time of trial, he was employed by Peoria Harbor and Fleeting Service as a tugboat pilot.

28. On February 16, 1969, Larry R. Moore was employed by plaintiff as a pilot and as Port Captain of its Pekin Division. As Port Captain he was a management representative at the port with authority to relieve a pilot and take over command of a vessel. On February 16, 1969, plaintiff operated the vessels "Christine Marie," "Gail Ann," "Eileen" and "Sandy M." Prior to February 16, 1969, Moore had served on occasion as pilot of each of such vessels.

29. At 9:00 a. m. on February 16, 1969, the "Christine Marie" was tied-off at the dock of Sours Grain Company, Pekin, Illinois. During the period from 9:00 a. m. to 9:00 p. m., she obtained Barge OR–53 from the M/V "Bob Benter" and towed such barge to the dock of Farmers Grain Co., Pekin, Illinois, where she tied off such barge; she towed barges AD–112 and AD–140 from the Pekin fleet of plaintiff to the dock of Central Soya Company, Pekin, Illinois; she obtained barges ATC–309, ATC–704 and ATC–406 from the M/V "Robin" and towed such barges to the Pekin fleet of plaintiff where she tied off such barges; and she checked the moorings of the barges at the Pekin fleet of plaintiff and at the elevators in Pekin harbor.

30. When Moore and Greenhalgh first came on duty at about 9:00 a. m. on February 16, 1969, they went to the engine room of the "Christine Marie" and checked her engines for oil, her clutches for fluid, her packing glands to see if they needed tightening, and her bilges to see if they needed pumping. Her packing glands were tightened by Greenhalgh at that time.

31. During this day shift on February 16, 1969, Moore and Greenhalgh were in the engine room of the "Christine Marie" several times. She did not have any unusual list during the day, she was very trim and she was not involved in any collision, grounding or other occurrence by reason of which she might have sustained any damage. Moore did not personally operate any of the bilge pumps of the "Christine Marie" during that watch. They did not have any problem or difficulty in operating any of the bilge pumps which may have been used.

32. Before Moore and Greenhalgh went off duty at about 9:00 p. m., they went to the engine room to check for water, to tighten the packing glands, to check the oil in the engines and clutches, and to make sure the "Christine Marie" was ready for the next watch. Greenhalgh placed the transfer pump by the starboard engine and operated and used it to strip what water was there. At this time the "Christine Marie" had a starboard list which was just enough so that there was no water under the port bilge pump, and what water was in the engine room was on the starboard side of the engine room. The amount of water in the engine room which was stripped out at this time was not an unusual amount. Greenhalgh did not have any problems in getting the transfer pump started.

33. During the period from 9:00 a. m. to 9:00 p. m. on February 16, 1969, both of the engines of the "Christine Marie" were shut down before Moore and Greenhalgh went off watch while they were checking her out for the next crew. Later, they started the starboard engine but were unable to get the port engine started. During the period from 9:00 p. m. on February 16, 1969 until shutoff by Moore before she sank, the starboard engine was used to operate the "Christine Marie" and the port engine was not operated.

34. At about 9:00 p. m. on February 16, 1969, Moore and Greenhalgh were re-

lieved by Knowles and Petit. At this time the "Christine Marie" was tied off at the dock of Sours Grain Company, Pekin, Illinois, and a mechanic was on board checking an engine.

35. When deckhand Petit first came on watch at about 9:00 p. m. on February 16, 1969, he went to the engine room and checked the shafts, packing glands and stuffing boxes and the engine and reduction gear for oil. At this time there was a normal amount of water coming through the starboard and port stuffing boxes of the "Christine Marie" and deckhand Petit did not observe any water entering her engine room from any other source.

36. At about 9:35 p. m., the M/V "Christine Marie," with Knowles and Petit aboard (the mechanic having departed), left the Sours' dock and proceeded upriver to the C.C.I. dock which was located on the right descending or westerly bank of the Illinois River at about Mile 154.1. She made this trip to pick up empty barge WBL–601B and to tow such barge to the Pekin fleet of plaintiff, and did so.

37. The M/V "Christine Marie" finished mooring or tying off barge WBL–601B at the Pekin fleeting area of plaintiff at about 10:55 p. m. on February 16, 1969 and then proceeded across the river to the lower end of the Sours' dock.

38. When the "Christine Marie" arrived at the Sours' dock

(a) she "touched in" along the side of a loaded barge located at the lower pilings of the Sours' dock;

(b) Knowles and Petit were in the wheelhouse of the "Christine Marie";

(c) Petit noticed that the "Christine Marie" was starting to list;

(d) Petit mentioned the list to Knowles and then started for the engine room to find out why the "Christine Marie" was listing.

39. Upon going to the engine room of the "Christine Marie," Petit observed that the vessel was taking water and then ran back to the pilothouse and told Captain Knowles that the "Christine Marie" was taking water and that the water was then up on the deckplates. After informing Knowles, Petit returned to the engine room. Knowles did not come to the engine room at this time.

40. After returning to the engine room, Petit went to the lower level and plugged the electrical cord from the port bilge pump into an electical outlet located above the port shaft, but noticed that the port bilge pump was not pumping. Petit then picked up the port bilge pump, inspected it for foreign particles and observed foreign particles in it. Petit then removed a screen at the bottom of the port bilge pump by removing three screws with a screwdriver and then cleaned the pump. After cleaning the port bilge pump, Petit put it back together and plugged the electrical cord of the port bilge pump into the electrical outlet above the port shaft a second time, but it still did not work. While inspecting and cleaning the port bilge pump at this time, Petit observed that water was coming into the engine room of the "Christine Marie" through the bottom of the port bilge pump.

41. Following the aforementioned activities, Petit disconnected the hose of the port bilge pump from the elbow, a two-inch pipe, six to nine inches in length, which went out through the port hull (port bilge exhaust line) of the "Christine Marie."

42. After disconnecting the hose of the port bilge pump, Petit observed water coming into the "Christine Marie" through the pipe from which the hose had been disconnected, but he made no effort to stop this substantial flow of water into the engine room of the "Christine Marie."

43. Petit then went to the starboard bilge of the "Christine Marie" and disconnected the hose of the starboard bilge pump and carried the starboard bilge pump from the starboard bilge to the port bilge where he connected the hose of the starboard bilge pump to the port bilge exhaust line.

44. Petit then plugged the electrical cord of the starboard bilge pump into

the electrical outlet located above the port shaft of the "Christine Marie," but the starboard bilge pump did not operate.

45. Petit then went from the lower deck of the engine room to the head room of the "Christine Marie" and obtained a dropcord. The head room was on the upper level in the forward part of the engine room. Petit returned to the lower level of the engine room and connected the dropcord to the electrical cord of the starboard bilge pump and plugged the dropcord into an electrical outlet on the starboard side in the engine room, but the bilge pump did not operate. By this time Pilot Knowles was in the engine room.

46. Petit then threw the dropcord to Knowles, who was then standing on the upper deck or level in the forward part of the engine room, and Knowles plugged the dropcord into one or more of the electrical outlets in the head room of the "Christine Marie," but the bilge pump did not operate.

47. Petit took at least one of the bilge pumps apart in an effort to figure out what was wrong with it.

48. The period of time which went by between the time Petit first observed water in the engine room, that he thought should be pumped out, until the "Christine Marie" sank was forty-five minutes to one hour.

49. On the night of February 16, 1969, Pilot Knowles did not go into the engine room of the "Christine Marie" at any time until after the "Christine Marie" had returned to the Sours' dock from her trip to the C.C.I. dock to the Pekin fleeting area of plaintiff and back to the Sours' dock.

50. The "Christine Marie" was tied off to a loaded barge below the Sours' dock when Petit informed Knowles that the "Christine Marie" was taking on water and that Petit could not get her bilge pumps to work.

51. At the time Petit first informed Knowles that the "Christine Marie" was taking water in her engine room, Knowles was in the pilothouse and he observed from there that the "Christine Marie" had a list to port.

52. Some time later Knowles went to the head of the stairs at the upper level of the forward walkway in the engine room of the "Christine Marie." At the time of his arrival there, Petit was down in the engine room, and Knowles could see water in the bilge of the "Christine Marie." The water was then just at the top of the deckplates in the engine room, not up on the steps in the engine room.

53. When Knowles first observed water in the engine room of the "Christine Marie," he regarded the amount as unusual and a "little excessive." At that time Knowles did not think there was any danger of the "Christine Marie" sinking. Knowles could hear water coming in the engine room, and it appeared to him that water was coming in from the port side. Knowles then asked Petit about the source of the water and Petit told him it was probably coming in through the port bilge hole or line. Knowles did not go down to the lower level deck in the engine room to see if water was actually entering the engine room through the port bilge hole. At this time Petit had one of the bilge pumps torn down and that bilge pump was on the aftersteps in the engine room of the "Christine Marie" when Knowles first saw it.

54. Following the activities described in the preceding finding, Knowles left the engine room to call Larry Moore. Before leaving, however, Knowles observed that the engine room was getting more water and that there was water above the floor plates. Knowles concluded at that time that the situation was getting serious and that there was a risk of the "Christine Marie" sinking.

55. Knowles called Larry Moore and informed him that the "Christine Marie" was in trouble. Thereafter, Knowles operated and navigated the "Christine Marie" and moved her upstream from a

point in the river alongside a loaded barge at the lower end of the Sours' dock to a point alongside an empty barge tied off at the Sours' dock. She was tied off to the empty barge with two lines, a bow line and a stern line, by Petit and Knowles. The empty barge was quite a bit higher than the guardrails of the "Christine Marie." Petit went up on the empty barge and Knowles assisted him in tying the stern line.

56. Moving the "Christine Marie" from alongside the loaded barge at the lower end of the Sours' dock to a point alongside the empty barge and tying off the "Christine Marie" to the empty barge took five to ten minutes. In this move, the "Christine Marie" traveled a distance of one hundred to two hundred feet. Just before this move was made, the water in her engine room was six to nine inches in depth above the deckplates. She was clearly operable and could have been navigated some distance at the time this move was made.

57. The levels or stages of the Illinois River at the Pekin Highway Bridge gauge at 7:00 a. m. on February 15, 16 and 17, 1969 were as follows:

| Date | River Stage |
| --- | --- |
| February 15, 1969 | 439.7 feet |
| February 16, 1969 | 439.5 feet |
| February 17, 1969 | 439.3 feet |

58. The stage of the Illinois River in the vicinity of the Sours' dock on February 16, 1969 was approximately 439.5 feet above sea level and an aerial photograph of the vicinity of the sinking taken on that day (Plfs. Ex. 28), in conjunction with a contour plat of the area made by the U. S. Army Corps of Engineers (Plfs. Ex. 37), clearly indicates the location of the water line shoreward and downstream of the pilings at Sours' dock with the Illinois River at that stage.

59. At the time the "Christine Marie" was tied off to or was alongside the loaded barge at the lower end of the Sours' dock, she could have been beached by backing her down and running her up inside the pilings of the Sours' dock, during which maneuvers she would have moved or traveled a distance of two or three hundred feet; or she could have been navigated to a point below the pilings at the Sours' dock and driven straight up on the bank there. Neither maneuver at that time would have presented a substantial danger to the crew on board, to the vessel herself, or to other navigation in the river.

60. The "Christine Marie" was moved and tied off to the empty barge to give Larry R. Moore a means to board her. After she was tied off to the empty barge, Knowles went to the head of the stairs of the forward walkway in the engine room. At the time of his arrival there, Petit was down in the engine room and was still trying to get a bilge pump to work, in the vicinity of the after stairway. When Knowles first arrived in the engine room this time, he could still hear water coming into the engine room. Knowles did not make any effort to assist Petit other than plugging in dropcords or handing him tools.

61. Following the call from Knowles, Larry R. Moore went to the Sours' dock and boarded the "Christine Marie." After boarding, he went to her engine room by way of her head deck and port side. While walking down her port side, before reaching the engine room, Moore observed the "Christine Marie" had a bad list to port. Her list to port at this time was such that Moore could "hardly" walk on her port deck.

62. Moore continued into the engine room where he talked briefly with Petit about the electric bilge pump and why it was not operating. At this time there was water above and covering the deckplates between the engines of the "Christine Marie," and Knowles then thought the "Christine Marie" was in dire distress.

63. After this conversation with Petit, Moore and Knowles went to the pilothouse of the "Christine Marie" and

Moore put out a "May Day" call on the "Christine Marie's" radio that she was in dire need of assistance. No actual assistance was received from any other vessel.

64. Before the "Christine Marie" sank, Larry Moore went down into her engine room and shut off her starboard engine. Moore was present at the scene approximately twenty-five minutes before she sank.

65. At the time the "Christine Marie" sank, her lights were on and her generator was running.

66. Pilot Knowles' duties on February 16, 1969 included the safety of the M/V "Christine Marie" and her crew and he was the Master of the "Christine Marie" immediately before and at the time she foundered and sank. He had not been relieved of his duties as Master before the "Christine Marie" sank. He was intending to "work a vessel" as soon as the water in her engine room had been discharged.

67. During the period immediately preceding the sinking of the "Christine Marie," Knowles did not make any determination as to how fast the water was coming into the engine room and did not make any effort to stop the flow of water.

68. During the days preceding February 16, 1969, on which Knowles was pilot of the "Christine Marie," he did not bother with any particulars as to whether the bilge pumps of the "Christine Marie" were operating or not operating.

69. A log of the "Christine Marie" for January 17, 1969 contains the following entry:

"Checked bilge pump check valve was bad. Took it off so pump would pump more water."

A log for February 15, 1969 contains the following entry:

"Fill gen. fuel tank, also fill furnace tank. Clean Bilge Pump—Tighten Packing Glands."

The logs for the month of December, 1968, for January of 1969, and for February 13, 14, 15 and 16, 1969, do not contain any other entry pertaining to any bilge, transfer or other pump of the "Christine Marie."

70. No evidence was presented indicating that any one or more of the bilge pumps of and on the M/V "Christine Marie" at the time she sank on February 17, 1969 was not operable at any time or times during the period from January 1, 1969 through the day watch on February 16, 1969, or that any major difficulty had been encountered with any one or more of her bilge pumps during such period of time.

71. Subsequent to the sinking of the M/V "Christine Marie" on February 17, 1969, she was raised, inspected and surveyed by defendant and others, partially repaired and returned to service.

72. The M/V "Christine Marie" was pumped out and brought to the surface at about 3:30 p. m. on Friday, February 21, 1969.

73. On Friday, February 21, 1969, and subsequently, the M/V "Christine Marie" was inspected and surveyed by marine surveyor Harry E. Reynolds of St. Louis, Missouri, for and on behalf of defendant. It is stipulated that his findings and recommendations are contained in his Report of Survey No. 092–69, and said Harry E. Reynolds was not called as a witness by either plaintiff or defendant.

74. During the period from 9:00 a. m. on February 16, 1969 until the "Christine Marie" sank in the early morning hours of February 17, 1969, water was not observed to be entering the engine room of the "Christine Marie" from any source other than through her port and starboard packing and stuffing boxes and through the pump, hose, lines and the opening in her hull of her port bilge discharge system. The water which entered her engine room through her starboard and port packing glands during

this period was only such amount as was normal and required for such glands to function properly.

75. After the "Christine Marie" was raised, plaintiff did not find any holes in her hull.

76. Following the raising of the "Christine Marie," defendant did not make any request of plaintiff that plaintiff preserve either her port bilge pump or her starboard bilge pump or any part of her stuffing glands or her generator or any other part of her electrical system for inspection or testing.

77. During the period September 1, 1968 through December 31, 1968, the "Christine Marie" was operated and navigated on the Illinois River during a total of 115 days and performed the services set forth in her logs for such days. Her logs for such period do not contain any entry of or regarding any collision, grounding or other occurrence by reason of which she might have sustained damage.

78. The incursion or entry of waters of the Illinois River into the engine room of the "Christine Marie" through the hull exhaust opening, line, hose and bilge pump of her port bilge discharge system, or parts thereof, was a direct and immediate cause of her foundering and sinking on February 17, 1969.

79. Had the incursion of such waters into the engine room of said vessel been stopped by either Petit or Knowles, by plugging the hull exhaust opening, line or hose of her port bilge discharge system, or by other simple means shortly after discovery of the source of such incursion, the "Christine Marie" would have remained afloat and would not have foundered and sunk.

80. The failures of Knowles and Petit to stop the incursion or entry of such waters into the engine room of the vessel "Christine Marie" through the port bilge discharge system of such vessel were direct and immediate causes of her foundering and sinking on February 17, 1969.

81. The failure of the bilge pumps to start when the cords thereof were plugged into electrical outlets in the engine room of the "Christine Marie" were direct and immediate causes of her foundering and sinking on February 17, 1969.

82. The "Christine Marie" was not unseaworthy or in an unseaworthy condition on February 16 and 17, 1969, prior to her sinking, and the fact that she was not equipped with and did not have a check valve in her port bilge discharge system at that time did not render her unseaworthy.

83. Any of the following Conclusions of Law which may more properly be considered Findings of Fact.

## CONCLUSIONS OF LAW

1. Any of the foregoing Findings of Fact which may more properly be considered Conclusions of Law.

2. This court has jurisdiction of the parties and the subject matter of this action is within the admiralty and maritime jurisdiction of this court.

3. The defendant here had the burden of proving its contentions of unseaworthiness and want of due diligence of owners or managers, and has failed to sustain such burden on either contention.

4. The failure of one or more of the bilge pumps of the "Christine Marie," under the circumstances of this case, constitutes a "breakdown of motor generators or other electrical machinery and electrical connections thereto," which was a risk or peril insured against under the Inchmaree Clause of the policy here involved, and plaintiff is entitled to recover for all loss and damage to the "Christine Marie" under such clause because of such failure.

5. The failure of deckhand Petit to take any action to stop the flow of water into the engine room of the "Christine Marie" through the hull opening, lines, hose and pump of her port bilge discharge system, after he discovered that

she was taking water through such system or parts thereof, constitutes negligence of a mariner which was insured against under the Inchmaree Clause of the hull policy here involved, and plaintiff is entitled to recover for all loss and damage to the "Christine Marie" under such clause because of such negligence.

6. Captain Knowles made an error in judgment in failing to beach the "Christine Marie" after danger or risk of her sinking actually became apparent to him, and such error in judgment, under the circumstances of this case, constitutes negligence of master, mariners or pilots which was insured against under the Inchmaree Clause of the hull policy here involved, and plaintiff is entitled to recover for all loss and damage to the "Christine Marie" under such clause because of such negligence.

7. The failure of Captain Knowles to take any action to stop the flow of water into the engine room of the "Christine Marie" through the hull opening, line, hose and pump of her port bilge discharge system after he was informed by Petit that she was taking water through such system or parts thereof constitutes negligence of masters, mariners or pilots, which was insured against under the Inchmaree Clause of the hull policy here involved, and plaintiff is entitled to recover for all loss and damage to the "Christine Marie" under such clause because of such negligence.

8. The incursion or entry of water into the engine room of the "Christine Marie" through the hull opening, lines, hose and pump of her port bilge discharge system, under the circumstances here found, constitutes a peril of the waters of the Illinois River, which was insured against under the perils clauses of the hull policy here involved, and plaintiff is entitled to recover for all loss and damage to the "Christine Marie" under such clause.

9. Plaintiff is entitled to recover of defendant the sum of $19,000, with interest at the rate of six percent (6%) per annum on the sum of $10,500 from July 1,

1969 to the date hereof, and interest at such rate on the additional sum of $8,500 from July 1, 1970 to the date hereof, together with costs.

It is so ordered and judgment is entered accordingly.