**RELIANCE INSURANCE COMPANY, Plaintiff,**

v.

**Bryant G. McGRATH, Defendant.**

**No. C 84–7279 TEH.**

United States District Court,
N.D. California.

Feb. 23, 1987.

Russell P. Brown, Meadows, Dorris, Stryker & Salentine, San Francisco, Cal., for plaintiff.

Charles H. Rible, San Mateo, Cal., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

THELTON E. HENDERSON, District Judge.

Reliance Insurance Company brought this action against its insured, Bryant G. McGrath, seeking declaratory judgment that it is not liable, under a marine insurance policy that it issued to the defendant, for the damage claimed to have been sustained by the insured yacht, MY MISTRESS II. 28 U.S.C. §§ 2201, 1333. The case was tried without a jury. Based on the following findings of fact and conclusions of law, I conclude that plaintiff is not liable for the claimed loss, and the defendant McGrath should take nothing by way of his cross-complaint.

## FINDINGS OF FACT

1. Plaintiff Reliance Insurance Company ("Reliance") is a Delaware corporation having its principal place of business in Philadelphia, Pennsylvania, and is licensed to do business and is doing business in the State of California as an insurer.

2. Bryant G. McGrath ("McGrath") is a citizen of the State of California residing in Menlo Park, California. McGrath was the insured under a standard All-Risk Marine Yacht Insurance Policy, Number YH5262805, issued by Reliance under certain terms and conditions against loss of or damage to his 37–foot wood Chris Craft motorboat named MY MISTRESS II. The policy was originally issued May 5, 1980, with a policy period of one year and renewed annually, the most recent policy period becoming effective May 5, 1984 through May 5, 1985. MY MISTRESS II was insured for Fifty Thousand Dollars ($50,000.00) on the hull and Five Thousand Dollars ($5,000.00) on any personal property on the vessel.

3. McGrath had owned wooden Chris Craft boats for 35 years. It had been his practice to haul his wooden boats every year to 18 months to inspect and repaint the hull bottom. In the four years prior to the sinking, however, MY MISTRESS II sat in the water alongside the dock, and prior to sinking, had not been hauled out and repainted for approximately three years.

4. The Policy provided in pertinent part:

**Sue and Labor:** In case of any loss or misfortune, it shall be lawful and necessary for the Insured, their factors, servants and assigns to sue, labor and travel for, in about the defense, safeguard and recovery of the property covered, or any part thereof without prejudice to this insurance; the charges whereof we, the company, will contribute according to the rate and quantity of the sum herein insured. It is especially declared and agreed that no acts of the company or Insured in recovering, saving or preserving the property covered, shall be considered as a waiver or acceptance of abandonment.

**Notice of Loss and Filing of Proof:** It is agreed by the Insured to report immediately to the nearest office of the company, or to the agent who shall have issued this Policy, every occurrence which may become a claim under this Policy and shall also file with the company, a detailed, sworn Proof of Loss and Proof of Interest within Ninety (90) days from date of loss.

**Coverage:** This Policy insures afloat or ashore, against all risks of direct physical loss of or damage to the property, covered from any external cause except as provided elsewhere in this Policy.

**Exclusions:** This Policy does not insure against loss, damage or expense caused by or resulting from: wear and tear, gradual deterioration, electrolysis, unseaworthiness, marring, denting, scratching, weathering or willful misconduct of the Insured.

**Negligence and Latent Defect:** Provided loss or damage has not resulted from want of due diligence by any owner of the vessel or by any Insured, this insurance also covers physical loss or damage to the property covered directly caused by the following:

Explosions, bursting of boilers, breakage of shafts or any latent defect in the hull or machinery (excluding in all cases the cost and expense of repairing or renewing the defective part); negligence of master, mariners, engineers, repairers, or pilots.

**Misrepresentation or Fraud:** This entire Policy shall be void if the Insured or its Agent has concealed or misrepresented any material fact or circumstance concerning this insurance or the subject thereof, or the interest of the Insured therein or in case of fraud or false swearing by the Insured touching any matter relating to this insurance or the subject thereof whether before or after a loss.

5. In mid-August 1983, defendant and his son took MY MISTRESS II from her berth, Berth 15 at Peninsula Marina, Redwood City, California, to get her refueled, a short distance from where she was docked. They did not take the boat into the harbor. This was the first time the boat had been out of her berth in two years. McGrath's signed statement to the investigating marine surveyor, Capt. F.K. Rabun, USN Ret., stated the following facts, in part, concerning that trip:

"I docked there (Pete's Harbor gas dock) for about one-half hour. When backing away from the dock into the channel, I heard some banging on the hull. As we proceeded back to Berth 15, I discovered that I couldn't reverse the starboard engine. I was able to get the vessel back to Berth 15 and moor it. Prior to hearing the banging when leaving Pete's Harbor, the vessel never took on water. During the last 2–3 months, the vessel has been taking on water at a fairly steady rate. There are automatic bilge pumps aboard. We have not had the pumps in the automatic mode. Twice a week I had an employee go down to the vessel and check the boat in general. In most cases, the employee had to turn on the bilge pump in the manual mode to pump the bilges. After I struck the submerged object about 6–8 months ago, I did not feel that much damage had been done to the vessel and consequently did not have it hauled immediately. During the rainy season, the vessel was taking on some water, but I felt it was from the rain. After the rainy season was over, the vessel was still taking on some water and that is when I felt I might have a leak as a result of striking a submerged object. It was my plan to have the vessel hauled at the end of September, 1984, to generally maintain the vessel and check out where the water was coming into the vessel.... After the vessel was hauled we observed a deep gouge on the port bow that I believed happened when I hit the submerged object about 6–8 months ago. I believe this is where the water entered my vessel. Further, I observed that a line was around the starboard shaft. It is my opinion that this was what prevented the starboard engine from going in reverse and what caused the starboard transmission to smoke when returning to Peninsula Marina about 6–8 months ago...."

/ / signed 9/14/84

6. The trip to the gas dock was the last time defendant used MY MISTRESS II before she sank. When defendant and his son returned to Berth 15, his son, in a wet suit, inspected the underwater portion of the hull by feeling along the bottom of the boat and particularly in the chine area of the hull with his hand. Young McGrath spent approximately 30 minutes inspecting the hull in the area of the bow and stern in this manner. Although he had a diving mask on, the water was muddy and murky, and he limited his inspection to where he could reach underwater with his hands.

7. Defendant McGrath last painted the hull bottom three years before the boat sank, putting on 2–3 coats of bottom paint; six years before she sank he had done a "complete" job, using 10 gallons of paint. The Court finds that a wooden-hulled ves-

sel that is not used regularly requires painting of the hull bottom every year to 18 months.

8. During the three years MY MISTRESS II sat in the Marina, no maintenance was performed on the boat's paint work except that defendant's son would periodically "wash the boat down from top to bottom." Further, the Harbor Master telephoned the defendant on at least one occasion to tell him the boat was listing and needed pumping and on three other occasions prior to the sinking he called the defendant to tell him to bail his boat out.

9. The Harbor Master notified defendant at 7:30 a.m. on the morning of September 4, 1984, that his boat had sunk at its berth and thereafter called the fire department which arrived a short time later and pumped the boat out.

10. The Harbor Master towed the boat to Pete's Harbor boatyard some 1000 yards away where she was hauled out of the water. The underwater hull was immediately steam-cleaned of marine growth and slime and thereafter scraped of barnacles covering three-fourths of the bottom. A stream of water about the size of a pencil was seen coming out of the boat from a damaged section of the port chine and the garboard plank beside the keel. The boatyard manager pointed out to defendant, at the time the boat was hauled out, the damaged area of the port chine. The Harbor Master also noticed that the hull was very dirty, had dead paint on it which no longer had anti-fouling properties, had worm damage, and generally "had poor maintenance on the bottom side."

11. On September 11, after the boat sat in the yard for one week, defendant telephoned Thompson & Paulin Insurance Agency to notify them that his boat had sunk and been pulled out of the water. Ms. Bunte took notes of this conversation and her notes indicate that defendant told her that the boat had sunk as a result of an anchor piercing the hull. Defendant did not tell her that he had caught on an anchor rope. Thereafter, the Agency notified Reliance of the loss and Reliance assigned Capt. Rabun to investigate the cause, na-

ture land extent of damage and to survey the boat. Reliance sent defendant a cablegram on September 13th informing defendant that only on inspection of the vessel by a qualified surveyor could Reliance be assured that defendant had taken the necessary steps to arrest aggravation of the flooding damage to the hull and machinery. The Court finds that such an inspection was a necessary prerequisite to coverage.

12. Defendant had earlier on September 13th reported to Capt. Rabun, which was noted in Capt. Rabun's case log for September 13, 1984, that he had "hit something" some six months or so before; that the boat sank on September 4th at its berth; that there were no leaks prior to hitting something; and that he had "pickled" the engines and cleaned up the boat after she sank. Defendant gave Capt. Rabun a signed statement of the circumstances concerning the sinking. Thereafter, they jointly inspected the vessel. With defendant in attendance, Capt. Rabun surveyed the cause, nature, and extent of damage resulting from the boat's having earlier struck a submerged object. Capt. Rabun took photographs of the hull's damaged areas which he attached to his Preliminary Survey Report of September 20, 1984. This report was sent to plaintiff's law firm and provided in pertinent part:

"Observations of damage resulting from the striking of a submerged object ... were as follows:

FOUND

1. Approx. 4' of chine strip port side torn out about 4' aft of bow (see note A).

2. Approx. 1½' of keel bottom gouged out approx. 20' aft of bow and just aft of scarfed in keel (see note A).

3. Starboard shaft suspect.

4. Starboard transmission suspect.

DAMAGES NOTED NOT RELATED TO INCIDENT (STRIKING OF SUBMERGED OBJECT)

5. About 3" × 9" section of keel eaten out by worms/borers about 10' from stern.

6. About 20% of underwater hull planking has varying degrees of worm/borer damage.

SURVEYOR'S NOTES

A. Damage to the area was severely aggravated by worm/borer action as a result of vessel not being promptly repaired after the incident (of striking a submerged object). Inner plywood planking is affected in area of item # 1.

B. Haul-out required to accomplish repairs.

C. Owner reports vessel was last hauled three years ago.

The area of the hull immediately inboard of where the chine strip was torn out starting about 4' aft of port bow was badly damaged by worms and borers. The inner plywood planking in the area was damaged by worms and borers. We were able to push an awl through the hull by hand toward the after end of this area. This damaged area varies from being very near the waterline forward to about 7" below waterline at aft end (see photos). We noted that about 20% of hull planking has varying degrees of worm and borer damage (see photos)."

13. Thus, Capt. Rabun determined that the boat sank as a result of failure to maintain the hull with anti-fouling bottom paint and damage (the torn-out strip) to the port chine of the hull which happened when defendant struck a submerged object. Capt. Rabun further determined that the boat was now a constructive total loss.

14. Had repairs to the port chine and in one section of the keel been accomplished promptly after striking the submerged object, they would not have exceeded Five Thousand Dollars ($5,000.00). The failure to accomplish timely repair combined with the failure to properly maintain the boat allowed marine worms and borers to attack the port chine area which had been damaged and scraped due to the striking and thereafter left without the protection of anti-fouling paint. The worms and borers finally consumed sufficient outer and inner hull planking in the port chine to allow water to enter the vessel in quantities sufficient to sink the vessel at its berth.

15. On November 13, 1984, Reliance notified defendant by letter that they would only pay Five Thousand Dollars ($5,000.00) less the deductible of Five Hundred Dollars ($500.00), which was the estimated cost of repairing only the striking damage to the hull. The offer by Reliance was rejected and McGrath stated he would sue Reliance.

16. At no time prior to the sinking was Reliance or any authorized agent notified of the striking of a submerged object, and defendant McGrath failed to take adequate measures to investigate the extent of damage from striking the submerged object and the cause of the leaking, nor did he effect any repairs.

17. Had Reliance been given prompt notice, it would have immediately initiated an investigation to determine the extent of damage sustained and would have caused repairs to be made. Accordingly, the failure to give notice seriously prejudiced Reliance.

18. Further, McGrath failed to act reasonably and prudently to protect and minimize loss to MY MISTRESS II by having her promptly hauled, inspected and repaired after striking a submerged object. But for his failure to act as a reasonable and prudent owner, the vessel would not have become a constructive total loss.

19. McGrath's failure to haul MY MISTRESS II every 12 to 18 months for hull maintenance and his failure to promptly haul and repair her hull after striking a submerged object caused the wooden hull to gradually deteriorate and become unseaworthy, resulting in her becoming a constructive total loss. These omissions constituted negligence and a lack of due diligence.

20. McGrath, with full knowledge when he renewed the insurance policy on May 5, 1984, concealed from Reliance that MY MISTRESS II had sustained damage in mid-August 1983, and, additionally that she was in a deteriorating unseaworthy condition. His failure to disclose same was material to the contract.

21. If any of the foregoing findings of fact are more properly conclusions of law, they shall be considered to be conclusions of law.

## CONCLUSIONS OF LAW

1. Because a marine insurance policy is the basis of the action and claim herein, jurisdiction lies under 28 U.S.C. § 1333. The claim is an Admiralty and Maritime one within the meaning of Rule 9(h) FRCP. Venue is properly laid in this District, because the contract of insurance was entered into here.

2. McGRATH has asserted a right to jury trial. The question of whether or not a party is entitled to a jury when jurisdiction is based on 28 U.S.C. § 1333 is solely a jurisdictional question. FRCP Rule 38(e); *Emerson G.M. Diesel v. ALASKAN ENTERPRISE*, 732 F.2d 1468, 1471, 1985 A.M.C. 2069, 2072 (9th Cir.1984); *Underwriters at Lloyd's v. May*, 1983 A.M.C. 2447, 2448 (S.D.Cal.1983); *Arkwright-Boston Mfg. v. Bauer Dredging*, 1978 A.M.C. 208, 74 F.R.D. 461 (S.D.Tex.1977); *Alaska Barite Company v. Freighters Inc.*, 54 F.R.D. 192 (N.D.Cal.1972). McGrath contended that the question of entitlement to a jury is determined by whether Federal law or State insurance law applies in deciding certain causes of action in the complaint, citing *Wilburn Boat Co. v. Fireman's Fund Ins. Co.*, 348 U.S. 310, 75 S.Ct. 368, 99 L.Ed. 337 (1955) and the Ninth Circuit decision in *Bohemia Inc. v. Home Ins.*, 725 F.2d 506 (9th Cir.1984). These cases only addressed the question of whether, in the *absence* of Federal legislation, a judicially fashioned admiralty rule, or a need for uniformity in admiralty, regulation of marine insurance would be left to the states and State law would control the interpretation of marine insurance policies. Neither case addressed the issue of whether there is a right to a trial by jury when jurisdiction is based on 28 U.S.C. § 1333 and the claim is identified as an admiralty and maritime claim within the meaning of FRCP Rule 9(h). RELIANCE invoked FRCP Rule 9(h) in Paragraph 1 of its complaint. The impact of a Rule 9(h) election is that normally the defendant will have no right to a jury trial. *Underwriters at Lloyd's v. May*, 1983 A.M.C. 2447, 2448 (S.D.Cal. 1983), citing 9 Wright and Miller, *Federal Practice and Procedure*, § 2315; *Arkwright-Boston Mfg. v. Bauer Dredging*, 1978 A.M.C. 208, 74 F.R.D. 461 (S.D.Tex. 1977). The Ninth Circuit has held that when a claim is cognizable either at law or in admiralty, the pleader may elect to proceed in admiralty, without a jury, by filing an identifying statement under FRCP Rule 9(h). *Emerson GM Diesel v. ALASKAN ENTERPRISE*, 732 F.2d 1468, 1471, 1985 A.M.C. 2069, 2072 (9th Cir.1984). The Ninth Circuit Court in *Emerson GM Diesel* went on to determine that the party appealing the District Court's denial of a jury trial had no right to a jury trial in admiralty and could not claim surprise, because the claim was designated as both in admiralty and at law. *Emerson GM Diesel, supra*, 732 F.2d at 1472.

3. While McGRATH argues that some of the issues in the case required reference to State law (e.g., existence of and application of warranties), the determination of whether McGRATH was entitled to a jury in this case is one which must be made on the basis of whether admiralty jurisdiction exists and not on the basis of whether State or Federal law applies in deciding any of the causes of action involved. Admiralty jurisdiction over a suit involving a marine insurance policy is unquestionable. *Albany Ins. Co. v. Wisniewski*, 579 F.Supp. 1004, 1013 (D.R.I.1984), citing *Kossick v. United Fruit Co.*, 365 U.S. 731, 81 S.Ct. 886, 890, 6 L.Ed.2d 56 (1961); *Wilburn Boat, supra*, 348 U.S. at 313, 75 S.Ct. at 370; *Insurance Co. v. Dunham*, 78 U.S. (11 Wall.) 1, 20 L.Ed. 90 (1870).

4. Under an "All Risk" Yacht Policy, in order to recover under such policy, the insured must prove that the loss was "fortuitous," that is, it did not occur through a lack of due diligence by the insured to inspect and repair the hull following the striking of a submerged object, and that the Policy was in effect at the time of the loss. *Aetna Insurance Co. v. Hattersley*, 1984 A.M.C. 112837, 2838

(D.Ore., 1983), citing *C.H. Leavell & Co. v. Fireman's Fund Insurance Company*, 372 F.2d 784, 787 (9th Cir.1967) and *Heindl-Evans, Inc. v. Reliance Ins.*, 1980 A.M.C. 2823, 2827 (E.D.Va.1979). Only then could the sinking even begin to be considered fortuitous. If the insured meets the burden of proving these things, the burden then shifts to the insurer to prove wear and tear or want of due diligence by the owner of the vessel in meeting the annual maintenance requirements as described above. *Carter Tug Service, Inc. v. Home Insurance Co.*, 345 F.Supp. 1193, 1972 A.M.C. 498 (SD Ill.1971). In these cases, the latter referencing a policy of identical form to that of the policy in the present case, the Court clearly distinguished negligence that was covered from negligence that was not covered, as where it consisted of a failure to exercise due diligence and to perform regular maintenance.

5. It was the failure to haul, inspect and replace the anti-fouling paint coating on defendant's wooden-hulled boat, when such maintenance must be carried out immediately after striking a submerged object, that resulted in the *unfortuitous* sinking of defendant's vessel. This is particularly clear where the vessel had been taking on inordinate amounts of water for sometime prior to ultimately sinking.

6. The burden of proof, or rather, the risk of non-persuasion, is cast on the insured boat owner because he has more information more easily available to him than to the insurer. *Northwestern Mutual Life Insurance Co. v. Linard*, 498 F.2d 556, 562 (2d Cir.1974), citing *Compania Naviera Santi, S.A. v. Indemnity Marine Insurance Co. (The TROPAIOFOROS)*, (1960) 2 *Lloyd's List* L.Rep. 469, 473 (Q.B. D.); *See*, F. Wigmore, *Evidence*, § 2486, at 275 (1940). If the probability that a vessel suffered a non-fortuitous loss, such as a scuttling, is equal to the probability that her loss was fortuitous, the evidence is in "equipoise" and the insured's case will fail. *Northwestern, supra*, 498 F.2d at 561, citing (*The GLORIA*), 54 Lloyd's List, L.Rep 35, 50–51 (A.B.D.1935) (Brandon, J.); *Aet-*

*na Insurance Company v. Hattersley, supra*, 1984 A.M.C. at 2839.

7. There is an express warranty embodied in the Sue and Labor Clause as well as an implied in law warranty that the owner must minimize his loss by timely inspection and repair. As found above, defendant's boat was a constructive total loss due to unseaworthiness from deterioration, wear and tear, and negligent maintenance (failure to use due diligence) by the owner, each of which is an exclusion under the policy.

"It is settled that a warranty in a contract of insurance must be literally complied with; that the only question in such cases is whether the thing warranted to be performed was or was not performed; and that breach of the warranty releases the company from liability regardless of the fact that a compliance with the warranty would not have avoided the loss." *Capital Coastal Corp. v. Hartford Insurance Co.*, 378 F.Supp. 163, 1974 A.M.C. 2039, 2051 (E.D.Va. 1974).

8. Defendant's policy does not insure against loss, damage or expense caused by or resulting from: wear and tear, gradual deterioration, unseaworthiness, marring, denting, scratching, weathering or willful misconduct of the insured. Thus, the damage resulting from worms and borers consuming the wooden hull planking is wear and tear, gradual deterioration, unseaworthiness and marring as well as the result of willful misconduct of the insured, all as described in Capt. Rabun's survey reports and photographs of the damaged areas of the hull. Defendant insured willfully allowed the boat to deteriorate by not hauling it for three years, all the while knowing, as is evident from testimony of his earlier practice of hauling out his boat every year to 18 months, that annual haulout is necessary for wooden-hulled boats in order to inspect and maintain the hull anti-fouling paint coating as well as to repair damage caused by the striking of a submerged object.

9. California Insurance Code, Section 1920 implies a warranty of seaworthiness

in the policy.[1] *See also,* California Insurance Code, Section 1921. If the vessel is unseaworthy at the time the insurance attached in this case (i.e., on May 15, 1984, when McGrath renewed the insurance), the breach voided the policy. *See Gulfstream Cargo, Ltd. v. Reliance Ins. Co. (The PAPOOSE),* 409 F.2d 974, 983 fn 26 and 28 (5th Cir.1969); *The Sask. Govt. Ins. Office v. Spotpack, Inc. (The SPOTPACK),* 242 F.2d 385, 388 (5th Cir.1957); 45 C.J.S. Insurance, § 650, at 555; *Levine v. Aetna Ins. Co.,* 139 F.2d 217 (2nd Cir.1943); *Fidelity-Phoenix Ins. Co. v. Chicago Title & Trust Co.,* 12 F.2d 573 (7th Cir.1926).

10. The language of the yacht policy involved in this case is clear: The policy effected insurance on defendant's boat afloat or ashore, and, in turn, defendant warranted that she was seaworthy and at least capable of navigating to the extent of the trading warranties in the policy, which for MY MISTRESS II were San Francisco Bay and tributaries, Pacific Coastal waters not north of Bodega Head and not south of Point Sur and not more than 50 miles from shore.

11. Defendant warranted expressly and impliedly under the Sue and Labor Clause of this policy that in case of any loss or misfortune to his boat, he would take all reasonable steps to protect and recover his boat, the reasonable expenses incurred being for the insurer's account. The insured is said to be under a duty to the underwriter to exercise the care of a prudent uninsured owner, i.e., an owner who knows he will have out-of-pocket responsibility for the loss. According to the testimony of Joe Copeland, plaintiff's expert in marine insurance claims and underwriting, which I accept, this has long been the established interpretation of the Sue and Labor Clause in the industry, and the underwriter is entitled to expect such conduct of the insured, i.e., that the insured will act to protect the insured property and minimize or prevent loss from an occurrence for which the underwriter would be liable under the policy. The bottom line of the Sue and Labor Clause is the insured's legal duty toward the underwriter to take action after an occurrence to prevent or minimize further loss. *Reliance Insurance Company v. The Yacht ESCAPADE,* 280 F.2d 482, 488 (5th Cir.1960); *American Merchant Marine Ins. Co. v. Liberty Sand & Gravel Co.,* 282 F. 514, 522 (3rd Cir.1922); *Republic of China v. National Union Fire Ins. Co.,* 151 F.Supp. 211, 238; 1957 A.M.C. 915 (D.Md.1957).

12. Defendant's failure, as admitted in his signed statement to Capt. Rabun, to promptly haul his boat to determine the nature and extent of damage caused by the striking of a submerged object and to have the damage timely repaired, breached his duty to RELIANCE expressly stated in the Sue and Labor Clause and implied by law. Breach of the warranty voided the policy coverage for the resulting constructive total loss. *Westchester Fire Ins. Co. of New York v. Pennsylvania R. Co.,* 96 F.2d 133, 134 (2nd Cir.1938).

13. There was a further express warranty breached by McGRATH: the express warranty of prompt notice to report the striking of a submerged object. He did not report this until after the vessel sank and became a constructive total loss. Failing the existence of well settled applicable Federal rules in regard to warranties in marine insurance policies, state law can be applied in interpreting warranties, promissory or otherwise, in marine insurance policies. *Wilburn Boat, supra. See also, Kossick v. United Fruit Co.,* 365 U.S. 731, 81 S.Ct. 886, 6 L.Ed.2d 56 (1961); *Bohemia, Inc. v. Home Ins. Company,* 725 F.2d 506, 510 (9th Cir.1984); *Ahmed v. Amer. SS Owners Mut. Protection,* 444 F.Supp. 569, 571, 572 (N.D.Cal.1978), *aff'd,* 640 F.2d 993 (9th Cir.1981). In California, delay in giving notice which actually results in substantial prejudice to the insurer, allows the latter to avoid liability under the policy. *Colonial Gas Energy System v. Unigard Mutual Ins. Co.,* 441 F.Supp. 765 (ND Cal.1977); *Gibson v. Colonial Insurance Company,* 92 Cal.App.2d 33, 206 P.2d 387 (1949);

---

**1.** Section 1920 provides "in every marine insurance upon a ship or involving transportation by ship, a warranty is implied that the ship is seaworthy."

*Abrams v. American Fidelity & Casualty Co.*, 32 Cal.2d 233, 195 P.2d 797 (1940); *Hynding v. Home Accounting Insurance Co.*, 214 Cal. 743, 752, 7 P.2d 999 (1932). RELIANCE was substantially prejudiced by McGRATH's failure to give prompt notice of the striking of the submerged object, and his failure to notify RELIANCE prevented underwriters' appointing a surveyor to inspect the vessel and insure that action was being taken to save her from further damage by hauling her to sight her bottom. And this failure ultimately resulted in her eventual sinking and becoming a constructive total loss.

■■■ 14. RELIANCE was entitled, on renewal of the policy, to McGRATH's voluntary disclosure of all circumstances which were material to the risk and his failure to do so vitiated the policy, regardless as to whether he claimed such failure was a result of mistake, accident, forgetfulness or inadvertence. Fraud by intentional concealment is not necessary if a policy of marine insurance is issued upon false and material misrepresentations. The absence of an intent to deceive or conceal will not save the contract from recission. *Albany Ins. Co. v. Wisniewski, supra; The PAPOOSE, supra; King v. Aetna Ins. Co.*, 54 F.2d 253 (2nd Cir.1931); *Rosenthal v. Poland*, 337 F.Supp. 1161, 1168 (SDNY 1972). A material concealment in reliance upon which a policy is issued is grounds for avoidance of the policy whether the concealment is made with knowledge of its falsity or instead is made through a good faith mistake. Keaton, *The Law of Insurance*, §§ 5, 7(a). This principle is codified in both § 1900, dealing with marine insurance, and §§ 330 and 359 of the California Insurance Code, dealing with non-marine insurance policies. Additionally, § 1904 of the California Insurance Code, specifically on marine insurance, provides:

"In marine insurance, if a representation by the insured is intentionally false in any respect, whether material or immaterial, the insurer may rescind the entire contract."

The dispositive issue in this regard is whether McGRATH's concealments were of material facts.

15. The doctrines of misrepresentation and concealment are described by the Court in *Albany Ins. Co., supra*, 549 F.Supp. at 1014 as occupying neighboring roles in the law governing the avoidance of marine insurance contracts, i.e., the assured is bound, even absent inquiry, to reveal every fact within his knowledge which is material to the risk, citing *Stecker v. American Home Fire Assurance Co.*, 299 N.Y. 1, 6, 84 N.E.2d 797, 798–799 (1949). The *Albany* Court concluded that distortion of the factual underpinnings upon which the contract of marine insurance rests, fairly attributable to the assured, cedes to the insurer a right to rescind, irrespective of whether the warp is brought about by knowing concealment of relevant facts or by outright misrepresentation. McGRATH's failure to disclose the damage caused by the striking of a submerged object when he renewed his one-year term policy on May 5, 1984, entitled RELIANCE to avoid the contract. The assured must disclose prior to entering into the contract every material circumstance known to him, and he is deemed to know every circumstance which in the ordinary course of business ought to be known to him. The Marine Insurance Act of 1906, § 18 (6 Edw. 7 C.41); *The PAPOOSE, supra*. The assured must disclose facts to the insurer relating to seaworthiness. *Tremaine v. Phoenix Assurance Company*, 6 Cal.App.2d 552, 45 P.2d 210 (1935). McGRATH's failure to disclose the deteriorating and unseaworthy condition of MY MISTRESS when he renewed the policy constituted nondisclosure of a material fact and allowed RELIANCE to rescind the contract.

16. The law of marine insurance imposes a duty upon the assured to disclose voluntarily to the insurer, even though no inquiry is made, every material fact and circumstance within his knowledge and which is unknown (or fairly presumed to be unknown) to the insurer, and failure to do so—intentionally or otherwise—allows the insurer to have the contract declared void

*ab initio. Albany Ins. Co., supra,* 549 F.Supp. at 1016, citing *The PAPOOSE, supra,* 409 F.2d at 980–981; *King, supra,* 54 F.2d at 254; *Btesh v. Royal Insurance Company of Liverpool Limited,* 49 F.2d 720 (2nd Cir.1931); *Contractors Realty Company, supra,* 469 F.Supp. at 1294; *Navagacion Goya S.A. v. Mut. Boiler & Mach. Ins.,* 411 F.Supp. 929, 935 (SDNY 1975); *Anne Quinn Corp. v. American Manufacturers Mut. Ins.,* 369 F.Supp. 1312, 1315 (SDNY 1973), *aff'd.,* 505 F.2d 727 (2d Cir.1974); *Stecker, supra,* 299 NY at 6, 84 N.E.2d at 798–799. *See, generally,* 2 J. Arnould, *Law of Marine Insurance and Average, supra,* § 590; L. Buglass, *Marine Insurance and General Average in the United States, supra,* at 2327; 9 Couch, *Encyclopedia of Insurance Law,* §§ 38:74–38:82 (2nd Ed.1985); Gilmore & Black, *The Law of Admiralty* (2nd Ed. 1975) 62.

17. A marine insurance policy is void *ab initio* where the assured fails to disclose material increases in the risk insured. *Pacific Queens Fisheries v. Symes,* 307 F.2d 700, 706, 709 (9th Cir.1962). The increase in the risk to MY MISTRESS II of being exposed to deterioration and wear and tear and ultimately becoming unseaworthy, following the striking of a submerged object, is a material fact that should have been known to anyone with a minimum of experience or understanding of the care and maintenance of wooden-hulled boats.

18. The marine insurance contract is conceived in uttermost good faith (*uberrimae fidei*), and the assured must disclose every material circumstance which in the ordinary course of business ought to be known to him. Thus the assured is obligated to volunteer information which might have a bearing on the scope of the risk assumed, and the failure to do so will allow the insurer to void the policy. *The PAPOOSE, supra,* 409 F.2d at 981; *Bouley v. Continental Casualty Co.,* 454 F.2d 85, fn. 3 (1st Cir.1972). The Doctrine of *uberrimae fidei* is applicable to all forms of marine insurance. *Sun Mutual Insurance Company v. Ocean Insurance Co.,* 107 U.S. 485, 1 S.Ct. 582, 27 L.Ed. 337 (1883); *Btesh, supra.*

19. California recognizes that the duty of an assured under a marine insurance contract is different than it is under other types of insurance. California Insurance Code § 1900, *Marine Insurance,* states:

Section 1900 *Duty to Disclose*

"In marine insurance each party is bound to communicate in addition to what is required in the case of other insurance: (a) All the information which he possesses and which is material to the risk, except such as is exempt from such communication in the case of other insurance; (b) The exact whole truth in relation to all matters that he represents or upon inquiry assumes to disclose."

The controlling principle cited above demonstrates that Federal admiralty precepts and those of California are completely harmonious on the dispositive issue of McGrath's being under a duty as a marine insurance applicant, to make full disclosure in "uttermost good faith."

"An applicant for marine insurance assumes a much stricter duty than does one seeking, for example, casualty coverage ... it is conceived in the uttermost good faith and incubated in a legal environment which transcends the sharper practices of the world of commerce. Either party's failure to render that standard of conduct renders the contract voidable at the instance of the other party."

*Albany Ins. Co., supra,* 549 F.Supp. at 1014, as cited in 2 J. Arnould, *Law of Marine Insurance and Average* (10 British Shipping Laws), § 547 (5th Ed.1961); L. Buglass, *Marine Insurance and General Average in the United States,* 110–11 (2nd Ed.1981).

20. Reliance is entitled to judgment in its favor, adjudging that the subject policy of marine insurance was and is void and unenforceable, that Reliance is not obligated to pay defendant McGrath any sum on account of his claim of constructive total loss of MY MISTRESS II and loss of personal effects. Defendant McGrath shall take nothing by his cross-complaint. Each

party shall bear its own costs of suit. Reliance is not entitled to attorneys' fees.

21. If any of the foregoing conclusions of law are more properly findings of fact, then they shall be considered findings of fact.